UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

UNITED STATES OF AMERICA, *et al., ex rel.*
JOSEPH PIACENTILE and KEVIN B. KILCOYNE,

                                      Plaintiffs,          04-CV-3983 (SJ)(RML)

       v.
                                                      **MEMORANDUM**
AMGEN, INC., *et al.*,                                  **AND ORDER**

                                     Defendants.
--------------------------------------------------------------------x

APPEARANCES:

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
By:    Carl H. Loewenson, Jr., & J. Alexander Lawrence
*Attorneys for Defendant U.S. Oncology, Inc.*

STONE & MANGNANINI LLP
100 Connell Drive, Ste. 2200
Berkeley Heights, New Jersey 07922
By:    David S. Stone & Robert A. Magnanini
*Attorneys for Relators Joseph Piacentile & Kevin B. Kilcoyne*

**JOHNSON**, Senior District Judge:

      Relators Joseph Piacentile and Kevin B. Kilcoyne (collectively,

"Relators") bring this *qui tam* action on behalf of the United States and 12

states, alleging that U.S. Oncology, Inc. ("U.S. Oncology" or "USON")

violated—and conspired with Kilcoyne's former employer, Amgen, Inc.

("Amgen"), to violate—the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and similar state statutes.  U.S. Oncology now moves to dismiss Relators' Fourth Amended Complaint ("FAC"), arguing, *inter alia*, that the FCA's public disclosure bar strips this Court of subject-matter jurisdiction over this action and that the FAC fails to allege the particularized facts necessary to state a claim under the FCA or the state statutes.  For the reasons set forth below, U.S. Oncology's motion to dismiss is granted and this action is dismissed with prejudice.

## BACKGROUND

This action has already been the subject of two lengthy opinions: *U.S. ex rel. Piacentile v. Amgen Inc.*, No. 04-CV-3983 (SJ) (RML), 2013 WL 5460640, at *2 (E.D.N.Y. Sept. 30, 2013) ("*Piacentile I*"), and *U.S. ex rel. Piacentile v. Amgen, Inc.*, 336 F. Supp. 3d 119, 123 (E.D.N.Y. 2018) ("*Piacentile II*").  Those opinions discussed, among other things, Piacentile's history of filing *qui tam* actions, the procedural history of this case, and the allegations of Relators' third amended complaint.  The Court assumes familiarity with the prior opinions but will briefly repeat or summarize portions of them in order to provide context for this Memorandum and Order.

The Procedural History

Relator Joseph Piacentile is a physician who, following his conviction on one count of conspiracy to submit false Medicare claims and one count of income tax evasion, has operated whistleblowersagainstfraud.com, a website that seeks to partner with individuals who have information about frauds perpetrated against the United States Government.  In September 2004, Piacentile—who had never worked for Amgen or U.S. Oncology—commenced this *qui tam* action on behalf of the United States, alleging that those two corporations violated four provisions of the FCA.  Piacentile acknowledges that between 2004 and 2011 many other whistleblowers also filed *qui tam* actions against Amgen for the conduct he alleged in this action. (FAC ¶ 9.)  He concedes that his was the second of these FCA actions but he maintains that his action was "the first to address Amgen's illegal kickbacks to oncology networks and physicians."  (*Id.* ¶ 10.)

Between 2007 and 2010, the pleading in this action was amended three times.  In April 2007, Piacentile filed an amended complaint which added Kilcoyne, a former Amgen sales representative, as a relator.  In June 2009, Relators filed a second amended complaint, which added four new defendants: Amerisource Bergen Corporation, Amerisource Bergen Specialty Group, International Physicians Network, and International

Oncology Network (collectively, the "ABC Defendants"). And in April 2010, Relators filed the Third Amended Complaint ("TAC"), which added 22 state-law claims to the four FCA causes of action contained in the first three pleadings. The TAC was brought not only on behalf of the United States, but also on behalf of 21 states and the District of Columbia (collectively, the "States").

In 2012, Amgen, United States, the States, and the relators in ten other *qui tam* actions filed against Amgen collectively reached a settlement of the claims regarding Amgen's marketing and promotion of certain drugs, including Aranesp, Epogen, Neulasta, and Neupogen. According to Relators, "Amgen paid $762 million to the [United States] Government and the States for precisely the conduct that Relators ... alleged in their complaint, *i.e.* that Amgen employed a variety of illegal methods to pay kickbacks to purchasing organizations and networks that were not reported to the Government, including oncology networks, to induce those physicians to purchase and prescribe Amgen's drugs." (FAC ¶ 16.) According to Relators, that 2012 global settlement agreement stated:

> Amgen offered or paid, or caused to be paid directly and indirectly through Amerisource Bergen Specialty Group, Amerisource Bergen Corp., Cardinal Health Specialty Pharmaceutical Distribution, International Nephrology

Network, International Oncology Network, Onmark, National Oncology Alliance, Oncology Supply, Inc., and Oncology Therapeutics, Inc., to healthcare providers, including, physicians, pharmacists, physician organizations, hospitals, managed care organizations, and group purchasing organizations and physician practice management organizations, remuneration, specifically in the form of cash, free product, free samples, product overfill, dinners, travel, hotels, consulting fees, education research grants, free consulting services, free reimbursement support services to assist physicians to secure coverage for Amgen products, improper remuneration disguised as proper discounts and rebates, improperly bundled products, payments for phony data collection studies and information collection programs, honoraria and speaker fees, for the purpose of influencing health care providers' selection and utilization of Aranesp, Enbrel, Epogen, Neulasta, Neupogen, and Sensipar regardless of whether the product was administered, reimbursable by federal health care programs, or medically necessary.

(FAC, p. 5, n. 6.)

Relators decided not to join in that settlement.  However, Relators did file an "Agreed Motion to Dismiss Relators' State Law Claims against Amgen with Prejudice," in which Relators, with the States' consent, sought to voluntarily dismiss with prejudice the State-law Claims against Amgen pursuant to Fed. R. Civ. P. 41(a)(2).  That motion was granted in an order dated January 16, 2013.

In a "Notice of Declination in Part" dated and filed on December 19, 2012, the United States declined to intervene in this action except to the

extent of filing a motion to dismiss with prejudice the claims brought on its behalf against Amgen.  In February 2013, the United States filed that motion, arguing, *inter alia*, that 31 U.S.C. § 3730(c)(2)(A) permits the Government to dismiss a *qui tam* action as a matter of prosecutorial discretion.  In *Piacentile I*, the Court granted the motion to dismiss on that ground.

On April 11, 2014, Relators filed a stipulation dismissing all claims against the ABC Defendants.  On that same day, the States filed a Notice of Declination to Intervene, declining to intervene with respect to Relators' State-law Claims against U.S. Oncology.  That left Relators as the only plaintiffs in this action and U.S. Oncology as the only remaining defendant.

U.S. Oncology then moved to dismiss the action, principally arguing that the TAC failed to allege the particularized facts necessary to state a claim under the FCA or analogous state statutes.  The Court granted that motion in *Piacentile II*.  The Court assumes familiarity with that memorandum and order and, accordingly, will only briefly summarize it here.

### *Piacentile II*

Preliminarily, the Court noted Relators' causes of action themselves contained no factual allegations whatsoever.  Rather, they consisted of two

sentences: one incorporating by reference all the allegations contained in the first 150 paragraphs of the TAC and another alleging that, "[a]s more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein," the defendants violated a specific provision of the FCA. (*Piacentile II*, 336 F. Supp. 2d at 127.)  The Court noted that this left the reader to guess which allegations related to each cause of action.  (*Id.* at 131.)  In addition, the four federal causes of action alleged violations of sections of 31 U.S.C. § 3729 which were amended in 2009, even though the allegations of the TAC principally alleged facts from earlier in that decade. (*Id.*)

The Court then addressed the specific causes of action and found that all but the fourth lacked the particularity required by Rule 9(b).  The Court held that the first two causes of action—which alleged violations of 31 U.S.C. § 3729(a)(1)(A) and (B) (2009), respectively—did not adequately identify the false claims for which Relators sought to recover and failed to even specify even a range of dates during which the claims were made. (*Piacentile II*, 336 F. Supp. 2d at 132.)  The Court also held that these two causes of action did not adequately explain the theory of liability that Relators intended to pursue and did not specifically allege that U.S. Oncology knew that the claims it filed on behalf of its customers were false.

(*Id.* at 132–34.)  The Court dismissed the State-law claims on similar grounds, finding that the TAC failed to allege those 22 claims with particularity.  (*Id.* at 138.)

With respect to the third cause of action, which alleged a violation of the "reverse false claims" provisions of 31 U.S.C. § 3729(a)(1)(G) (2009), the Court assumed that the third cause of action related to the Medicaid Rebate Statute ("MRS"), 42 U.S.C. § 1396r-8 — the only provision mentioned in the TAC which obligated any of the defendants to pay money to the Government.  (*Piacentile II*, 336 F. Supp. 2d at 135.)  However, the TAC alleged that the MRS obligated drug manufacturers to report "best price" information to the Centers for Medicare and Medicaid Services and to pay rebates calculated from this information, and did not allege that the statute imposed any financial obligation on U.S. Oncology.  (*Id.*)

With respect to the fourth cause of action, which alleged a conspiracy to violate provisions of 31 U.S.C. § 3729(a)(1), the Court held that allegations of conspiracy in the TAC did not even satisfy the Rule 8 standard.  (*Piacentile II*, 336 F. Supp. 2d at 136.)  However, the Court granted Relators leave to amend their complaint for a fourth time.  (*Id.* at 138.)

The Fourth Amended Complaint

In November 2018, Relators filed the FAC.  Unless otherwise indicated, the following facts are drawn from the FAC and are assumed to be true for purposes of this Memorandum and Order.

Although Amgen is no longer a party to this action, the allegations of the FAC focus largely on a scheme involving this and other pharmaceutical companies.  Amgen manufactures and markets, among other things, the prescription drugs Aranesp, Neulasta, and Neupogen, which are designed to be administered in a physician's office.  (FAC ¶ 2.)  Medicare Part B covers these drugs and the federal government, through its Medicare and Medicaid programs, is among the drugs' principal purchasers.  (*Id.* ¶¶ 2–3.)

Between 2001 and 2011, Amgen used illegal incentives, such as kickbacks, to convince oncologists to use these drugs, rather than similar drugs manufactured by their competitors.  (*Id.* ¶ 5.)  Since the kickbacks allegedly violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), the FCA, the Medicaid Best Price Statute, 42 U.S.C. § 1396r-8, and various state false claims acts, Amgen "ensured that the kickbacks were kept secret from and not reported" to the federal or state governments by Amgen or the oncology networks.  (FAC ¶¶ 6–7.)  As a result, the government paid an inflated rate for the drugs and the oncologists profited from the "spread"

between the government's compensation and the amount they actually paid after rebates and other incentives. (*Id.* ¶ 39.) Amgen "marketed the spread," using a "Net Cost Calculator" and other tools to inform the oncologists of the profit they would realize by using the Amgen products. (*Id.* ¶¶ 154–55.)

In furtherance of this scheme, Amgen targeted large "oncology networks" that "controlled numerous physicians." (*Id.* ¶ 5.) U.S. Oncology was one such network; as of 2004, it owned and operated 477 oncology practices, which employed a total of over 850 physicians, and 77 free-standing comprehensive cancer centers, which provided chemotherapy treatment and other services. (*Id.* ¶¶ 58–59.) However, U.S. Oncology also offered services to oncology practices which it did not own. (*Id.* ¶¶ 54–56, 123–24.) These services varied from a "comprehensive strategic alliance," in which U.S. Oncology would own or lease all of the real and personal property used by the practice and generally manage the practice's non-medical business operations, to a "Targeted Physician Alliance," in which U.S. Oncology would provide only a subset of the services provided under the "comprehensive strategic alliance." (*Id.* ¶¶ 54–56.)

Although the FAC alleges that Amgen's scheme began in 2001, the FAC alleges that Amgen and U.S. Oncology had been doing business with

one another since at least 1994.  According to Cynthia Radford, U.S.
Oncology's Director of Business Development from 2002 to 2004, U.S.
Oncology negotiated a 1994 contract with Amgen, committing to purchase
a certain amount of Aranesp in exchange for certain "kickbacks."  (*Id.* ¶ 97.)
Radford claims other pharmaceutical manufacturers had similar contracts,
(*id.* ¶ 99), which required the manufacturers to provide "rebates" and other
remuneration to U.S. Oncology.  (*Id.* ¶ 91.)  U.S. Oncology kept a portion of
the rebates as profits, but passed along the remainder to its physicians.  (*Id.*)
In order to encourage the physicians to increase their prescription of drugs
that provided rebates, U.S. Oncology provided the doctors with a Quarterly
Business Review that "detailed the kickback checks they were due to
receive from pharmaceutical companies."  (*Id.* ¶¶ 94–95.)  In addition, U.S.
Oncology convinced or directed hundreds of physicians to use the
pharmaceuticals on which it was making money, so as to meet the "use-
based metrics" of its contracts with the drug manufacturers.  (*Id.* ¶ 96.)

    According to Radford, those types of contracts persisted until at least
2004.  (*Id.* ¶ 100.)  Piacentile interviewed four people involved in
negotiating a February 2002 agreement between Amgen and U.S. Oncology
pertaining to Aranesp, Neulasta, and Neupogen.  These included Radford;
Anthony Corrao, a former Amgen sales executive who managed the

negotiation for Amgen, (*id.* ¶ 73); and Michael Louviere, Vice President of Marketing for U.S. Oncology, who had been directly and significantly involved in the negotiations, (*id.* ¶ 77). In or about 2004, Piacentile interviewed George Lorenz, a Regional Manager at Amgen, who had apparently entered into a separate agreement with U.S. Oncology.

The witnesses all recalled U.S. Oncology using its purchasing power to demand price concessions and other incentives from Amgen. Lorenz recalled U.S. Oncology forced him to agree to a 25% discount on drugs in exchange for placing those drugs on U.S. Oncology's formulary. (*Id.* ¶ 126.) Similarly, the FAC alleges that during the 2002 negotiation, "U.S. Oncology used its group purchasing power to 'shake down'" Amgen for "kickbacks" and to demand that Amgen "bend the rules" in other, unspecified ways. (*Id.* ¶ 101). U.S. Oncology made it clear that in order to get its business, Amgen would have to provide incentives better than those provided by suppliers of competing drugs. (*Id.* ¶ 75). Amgen capitulated, providing rebates and other incentives. (*Id.* ¶ 76).

Because Amgen believed that making payments directly to the physicians would help to motivate the doctors to use its products, Amgen insisted that the contract with U.S. Oncology provide for "split payments" of the rebates. (*Id.* ¶¶ 139.) Thus, if U.S. Oncology purchased the amount

of Amgen drugs specified in the contract, Amgen would issue checks to both U.S. Oncology and its practices. (*Id.* ¶ 129). According to Radford, U.S. Oncology would receive the checks quarterly, "skim a percentage of those payments," then pass the remainder to individual practices. (*Id.* ¶¶ 134–35.) The checks that were payable to the practices were delivered by sales representatives like relator Kilcoyne, who recalled bringing the highly anticipated checks to U.S. Oncology practices in his sales area. (*Id.* ¶¶ 137–38.)

According to Louviere, U.S. Oncology demanded other incentives in addition to rebates because it was worried about having to disgorge rebates that reduced the amount U.S. Oncology actually paid to below the federal "best price" level. (*Id.* ¶ 159.) These included inflated "data fees" that were "tied to the market share of the drug" that U.S. Oncology purchased rather than to the cost of collecting the data, (*id.* ¶¶ 159–63); free equipment, such as computers, and free services, including practice management consulting services, (*id.* ¶¶ 165–67); "educational grants" that were based solely on sales rather than scientific considerations, (*id.* ¶¶ 168–72); honoraria or "speaking fees" that were used as rewards for prescribing Amgen drugs, (*id.* ¶¶ 173–78); and travel packages for meetings at luxury hotels, ostensibly for the purpose of educating physicians about Amgen

products, (*id.* ¶¶ 179–80).  Like the educational grants and honoraria, the travel packages were used to reward U.S. Oncology and its physicians for prescribing Amgen drugs, rather than for educational purposes.

According to Radford, U.S. Oncology "changed its model" in 2004, abandoning rebates in favor of "prebates," which were built into the purchase price the U.S. Oncology physicians paid for drugs.  (*Id.* ¶ 149.) Under this model, the purchase price included a markup that went to U.S. Oncology.  (*Id.*)  The FAC does not allege how long U.S. Oncology continued to use this model.  Indeed, aside from recounting developments in legal cases involving Amgen and other oncology networks, the FAC contains virtually no allegations specifically relating to the period after 2004.

In contrast to this lengthy description of Amgen's agreements with U.S. Oncology, the FAC contains few allegations regarding the allegedly false claims which are the subject of this action.  The pleading alleges that U.S. Oncology physicians, to whom "kickbacks" had been paid, prescribed a large volume of Amgen drugs to beneficiaries of Medicaid, Medicare, and other federal and state healthcare programs.  (*Id.* ¶ 49.)  U.S. Oncology submitted claims on behalf of these physicians, in which it failed to disclose the kickbacks and other benefits the physicians had received and "routinely

escalated the reimbursement rate for the drugs it purchased from Amgen."
(*Id.* ¶¶ 50, 80, 85.)   According to the FAC, such claims were fraudulent
because they sought reimbursement for Amgen drugs at rates significantly
above the levels the network physicians would have received had they
disclosed the kickbacks. (*Id.* ¶ 51.)  In addition, U.S. Oncology "falsely
certified, in violation of the FCA, that the claims it submitted or caused to
be submitted to the Government were made in compliance with federal
law," including "the AKS and the Medicaid Rebate Statute." (*Id.* ¶¶ 85–86.)

Causes of Action and Remedies

The FAC's 20 causes of action are very similar to the causes of action
in the TAC in several respects.  The first paragraph of each cause of action
"repeat[s] and incorporate[s] by reference" allegations in the preceding
paragraphs.  Unlike the TAC, the FAC identifies the relevant allegations,
albeit in very broad strokes.  Indeed, although the 20 causes of action allege
violations of different provisions of the FCA and various state laws, they all
reference the same 133 paragraphs: "Paragraphs 37–43 (relating to the
solicitation and receipt of kickbacks and additional unlawful
remuneration), 66–183 (details of the conspiracy between Amgen and U.S.
Oncology and the various violations that resulted in the presentation and
submission of false claims for payment to the Government), and 184–191 (a

summary of the unlawfulness of U.S. Oncology's conduct)."  (FAC ¶¶ 225, 227, 229, 231, 233, 235, 237, 239, 241, 247, 253, 259, 265, 271, 280, 286, 292, 298, 303, 313.)

The first eight causes of action, which allege violations of the FAC, contain only two paragraphs, the second of which tracks the relevant statutory language of the relevant provisions of the FCA.  Because the relevant statutory provisions were amended in 2008 and 2009, there are two causes of action with respect to each FCA violation.  For example, the first cause of action alleges that U.S. Oncology "knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)" prior to May 20, 2009, while the second cause of action alleges that U.S. Oncology "knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A)" after the statute was amended on May 20, 2009.  The third cause of action alleges that prior to June 7, 2008, U.S. Oncology "knowingly made, used, or caused to be made or used false records or statements—*i.e.*, the false certifications and representations made or caused to be made by defendants—material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(2)."  The fourth cause of action relates to post-June 7, 2008, conduct and alleges a violation of 31 U.S.C. §

3729(a)(1)(B) — the amended version of the statute named in the third cause of action.  Similarly, the fifth and sixth causes of action allege violations of 31 U.S.C. § 3729(a)(7) (1994) and 31 U.S.C. § 3729(a)(1)(G) (2009), respectively — the pre- and post-amendment versions of the statutory provision that prohibits making or using a false record or statement to avoid an obligation to refund.  The seventh and eighth causes of action allege violations of 31 U.S.C. § 3729(a)(3) (1994) and 31 U.S.C. § 3729(a)(1)(C) (2009), respectively — the pre- and post-amendment versions of the statutory provision that prohibits conspiring to have false or fraudulent claims paid by the United States.

The remaining 12 causes of action allege violations of state-law provisions analogous to the FCA.  As with the state-law claims in the TAC, these causes of action are largely formulaic.  After the paragraph repeating and incorporating by reference the same 133 paragraphs identified in the FCA claims, the cause of action alleges that "Defendants [*sic*] knowingly presented or caused to be presented, false or fraudulent claims" to a particular state government.  The third paragraph charges that "[b]y virtue of the acts described" in the preceding paragraphs, "Defendants [*sic*] knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce" the particular state

government "to approve and pay such false and fraudulent claims."  The fourth paragraph alleges that the particular state government, being "unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented … paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants [*sic*]" as alleged in the TAC.  The fifth paragraph alleges that, "[b]y reason of the Defendants' [*sic*] acts," the particular state "has been damaged, and continues to be damaged, in a substantial amount to be determined at trial."  The sixth and final paragraph alleges that pursuant to the particular state law allegedly violated, the state "is entitled to three times the amount of actual damages plus the maximum penalty" allowed by the statute "for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants [*sic*]."

Only two of the 12 causes of action depart from this formula.  The first paragraph of the fourteenth cause of action, alleging violations of Massachusetts law, specifically mentions seven of the 133 paragraphs which detail actions alleged to have occurred in Massachusetts.  (FAC ¶ 271.)  The next three paragraphs recount those Massachusetts-specific allegations, stating that Kilcoyne recalled delivering "rebate" checks to

18

physicians at three Massachusetts-based U.S. Oncology practices and to
Berkshire Hematology Oncology, a U.S. Oncology practice, and that
"Berkshire Hematology Oncology never reported these illicit kickback
checks to the State of Massachusetts when submitting claims for payment to
the government-run health care programs, including but not limited to, the
Massachusetts Medicaid Program." (*Id.* ¶¶ 272–74.)

The nineteenth cause of action, alleging violations of Texas law, also
departs from the formula. The first paragraph of that cause of action
identifies three paragraphs alleging that U.S. Oncology was incorporated in
Texas and operated a billing center there. (*Id.* ¶ 303.) The next three
paragraphs essentially repeat those Texas-specific allegations. The FAC
then states: "The illegal kickback scheme and other related illegal conduct
set forth above was part of U.S. Oncology's main strategy for driving
revenue and profits, and was known about, negotiated for, approved of,
and promoted by executives at U.S. Oncology's highest levels, include the
corporate office in Texas." (*Id.* ¶¶ 304–06.) However, this cause of action
does not refer to specific claims made to Texas agencies.

The FAC principally seeks money damages. In addition to
demanding "an amount equal to three times the amount of damages the
United States Government has sustained because of defendant's actions,

which Relators currently estimate to be in the hundreds of millions of dollars," the FAC seeks a "a civil penalty of not less than $6,500 and not more than $11,000 (adjusted for inflation), or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq.* (FAC p. 77.)  Similarly, the FAC demands "statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' [*sic*] actions, as well as the maximum statutory civil penalty for each violation by Defendants [*sic*] within each State" as provided in various state statutes.  (*Id.* pp. 77–78.)

U.S. Oncology's Motion to Dismiss

U.S. Oncology now moves to dismiss the FAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Defendant's Memorandum of Law in Support of the Motion ("Defendant's Memo") (Doc. No. 175-1) raises four points, though two of the points are similar.  In the first and fourth points, Defendant argues that the FAC has not cured the pleading deficiencies identified in *Piacentile II* and that all causes of action should be dismissed because the FAC fails to allege any false claims with the particularity required by Rule 9(b).  In the second point, Defendant, pointing to three non-*qui tam* cases filed prior to the commencement of this action, argues that the FCA's "public disclosure bar" divests the Court of

subject-matter jurisdiction over this action.  In the third point, Defendant argues that Kilcoyne's claims are also barred in their entirety by the FCA's first-to-file rule because he was added as a co-relator after the filing of the original complaint.  Finally, Defendant argues that it would be futile to grant Relators further leave to amend.

Relators have filed a Memorandum in Opposition to the motion ("Relators' Opposition") (Doc. No. 175-6), which opposes the motion in all respects.  Defendant has responded to Relators' arguments in a Reply Memorandum (Doc. No. 175-7).  The arguments raised in these two briefs are described, if necessary, in the Discussion below.

### STANDARD OF REVIEW

Although Defendant's notice of motion (Doc. No. 175) seeks to dismiss the FAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and makes no mention of Rule 12(b)(1), Defendant's second point, relating to the "public disclosure bar," is jurisdictional.  Accordingly, the Court addresses the standards applicable to motions to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) as well as motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6).

Rule 12(b)(1)

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may

be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47,

56 (2d Cir. 2016).  The former is "based solely on the allegations of the

complaint or the complaint and exhibits attached to it (collectively the

'Pleading')." *Id.*  In reviewing a facial attack to the court's jurisdiction,

courts "draw all facts—which [are] … assume[d] to be true unless

contradicted by more specific allegations or documentary evidence—from

the complaint and from the exhibits attached thereto." *Amidax Trading Grp.*

*v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  The plaintiff has no

evidentiary burden with respect to these facial challenges. *Carter*, 822 F.3d

at 56.

In contrast, the plaintiff has an evidentiary burden where, as here, a

defendant makes "a fact-based Rule 12(b)(1) motion, proffering evidence

beyond the Pleading." *Id.* at 57.  "In opposition to such a motion, the

plaintiffs … need to come forward with evidence of their own to controvert

that presented by the defendant 'if the affidavits submitted on a 12(b)(1)

motion … reveal the existence of factual problems' in the assertion of

jurisdiction." *Id.* (quoting *Exchange National Bank of Chicago v. Touche Ross &*

*Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)).  "The plaintiff bears the burden of

proving subject matter jurisdiction by a preponderance of the evidence." *Mantena v. Johnson*, 809 F.3d 721, 727 (2d Cir. 2015) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012)).

The second point in Defendant's Memo raises a fact-based Rule 12(b)(1) argument. As discussed more fully below, Defendant has proffered evidence that the core allegations underlying this action were previously publicly disclosed in three civil complaints. This showing imposes on Relators "the burden to show by a preponderance of the evidence that the FCA's public disclosure bar did not deprive the district court of jurisdiction." *U.S. ex rel. Hanks*, 961 F.3d at 136.

Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss a cause of action that "fail[s] to state a claim upon which relief can be granted." In deciding a Rule 12(b)(6) motion to dismiss, the court must "accept[ ] all factual allegations in the complaint as true" and "draw[ ] all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). However, the tenet that all factual allegations contained in the complaint are assumed to be true is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face." *Lundy*, 711 F.3d at 113 (quoting *Iqbal*, 556 U.S. at 678).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  To determine whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Id.* at 679.  A plaintiff need not show that a defendant's liability is a "probability," but a plaintiff must raise "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

### Public Disclosure Bar

Although Defendant's Memo raises the public disclosure bar in its second point, this argument must be addressed first because the version of

the FCA public disclosure bar applicable to this action "is explicitly

jurisdictional." *U.S. ex rel. Hanks v. United States*, 961 F.3d 131, 136 (2d Cir.

2020).  It provides:

> No court shall have jurisdiction over an action under [the
> FCA] based upon the public disclosure of allegations or
> transactions in a criminal, civil, or administrative hearing, in a
> congressional, administrative, or Government Accounting
> Office report, hearing, audit, or investigation, or from the
> news media, unless the action is brought by the Attorney
> General or the person bringing the action is an original source
> of the information.

31 U.S.C. § 3730(e)(4)(A) (1994).  This provision "is intended to bar

'parasitic lawsuits' based upon publicly disclosed information in which

would-be relators 'seek remuneration although they contributed nothing to

the exposure of the fraud.'" *U.S. ex rel. Kreindler & Kreindler v. United Techs.*

*Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (quoting *U.S. ex rel. John Doe v. John*

*Doe Corp.*, 960 F.2d 318, 319 (2d Cir.1992)).  The public disclosure bar

vindicates the purpose behind the FCA's qui tam provisions, since "it will

usually serve no purpose to reward a relator for bringing a *qui tam* action if

the incident of fraud is already a matter of public knowledge by virtue of

'public disclosure.'" *United States v. CAC–Ramsay, Inc.*, 744 F.Supp. 1158,

1159 (S.D.Fla.1990), *aff'd*, 963 F.2d 384 (11th Cir. 1992).

For the "public disclosure bar" to apply, "there must be 'public disclosure' of the information on which the allegation of fraud rests, and this 'public disclosure' must occur through one of the sources enumerated in the statute." *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 (2d Cir, 2010), *rev'd on other grounds*, 563 U.S. 401 (2011). Those enumerated categories of sources are construed broadly. *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407–09 (2011). Thus, the phrase "civil, criminal, or administrative hearing" includes "'allegations and information disclosed in connection with civil, criminal, or administrative litigation,' including information disclosed during discovery." *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 70 (D. Conn. 2006) (citing *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1156 (3d Cir. 1991); *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1350 (4th Cir. 1994)).

"[T]he public disclosure (via an enumerated source) must be of the material elements of the 'allegations or transactions' on which the claim is based." *Kirk*, 601 F.3d at 103. As used in § 3730(e)(4)(A), the term "allegations" refers the relator's allegations in the complaint as amended, not the allegations in the original pleading. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007). Accordingly, courts look to the most recent

allegations in determining whether there is jurisdiction under § 3730(e)(4), even if those allegations are not contained in any pleading. *See, e.g., id.* at 474 (looking to the allegations in the pretrial order since the pretrial order is deemed to amend any previous pleading).

There is disagreement in the Circuits as to the meaning of the phrase, "based upon," as used in § 3730(e)(4)(A). "The majority view holds that as long as the relator's allegations are substantially similar to information disclosed publicly, the relator's claim is 'based upon' the public disclosure even if he actually obtained his information from a different source." *U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 57 (1st Cir. 2009) (citing cases). The Fourth and Seventh Circuits "have interpreted the phrase more narrowly, requiring proof that the relator's allegations are actually derived from the publicly disclosed information." *Id.* (citing cases). The Second Circuit, which has held that "[p]ublic disclosure of the allegations divests district courts of jurisdiction over *qui tam* suits, regardless of where the relator obtained his information," *U.S. ex rel. Doe*, 960 F.2d at 324, adheres to the majority view. *See Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 297 n. 11 (S.D.N.Y. 2013); *U.S. ex rel. Blundell v. Dialysis Clinic, Inc.*, No. 09-CV-710 (NAM/DEP), 2011 WL 167246, at *6 (N.D.N.Y. Jan. 19, 2011).

In addition, a *qui tam* action does not have to be based solely upon allegations or transactions that have been publicly disclosed in an enumerated source in order for the public disclosure bar to apply. The Second Circuit has endorsed the view that § 3730(e)(4)(A) "applies to a *'qui tam* action ... based in any part upon publicly disclosed allegations or transactions.'" *U.S. ex rel. Kreindler & Kreindler*, 985 F.2d at 1158 (quoting *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 553 (10th Cir. 1992)).

In this case, Defendant has proffered evidence that the core allegations underlying this action were publicly disclosed in civil complaints filed prior to the commencement of this action. Defendant argues that three non-*qui tam* complaints publicly filed in 2001 and 2003 — before this case was filed in 2004 — "alleged wrongdoing 'nearly identical' to this action and ... based on the 'same essential facts.'" (Defendant's Memo at 16.) Those three complaints were discussed in this Court's opinion in *U.S. ex rel. Hanks v. U.S. Oncology Speciality, LLP*, 336 F. Supp. 3d 90 (E.D.N.Y. 2018), *vacated and remanded sub nom. U.S. ex rel. Hanks v. United States*, 961 F.3d 131 (2d Cir. 2020), where the Court summarized those complaints as follows:

The first, *Citizens for Consumer Justice v. Abbott Laboratories, Inc.*, D. Mass. No. 01-CV-12257-PBS, was … filed in late 2001 by 13 non-profit organizations, alleging that pharmaceutical manufacturers, including Amgen, 1) overstated the [Average Wholesale Price] of various "Medicare Covered Drugs," 2) promoted sales of the drugs by creating a "spread" between the costs of the drugs to healthcare providers and the amount of Medicare reimbursement and 3) encouraged the providers to claim Medicare reimbursement for free samples.  The second, *County of Suffolk v. Abbott Laboratories, Inc.*, [E.D.N.Y.] No. 03-CV-229 (DRH), alleged that dozens of pharmaceutical manufacturers, including Amgen, conspired with others, including physicians and other medical providers, in a fraudulent scheme "to collect inflated prescription drug payments" from the county-funded Medicaid program.  The third case, *County of Westchester v. Abbott Laboratories, Inc.*, S.D.N.Y. No. 03-CV-6178 (SCR), resembled County of Suffolk in that it was brought by a county government against dozens of pharmaceutical manufacturers, including Amgen, alleging that the manufacturers artificially inflated and fraudulent[ly] reported the [Average Wholesale Price] of their drugs, and failed to report "best prices," as required by 42 U.S.C. § 1396r-8.

*Hanks*, 336 F. Supp. 3d at 111.

While none of these three complaints alleged a violation of the FCA, the Court finds that the fraudulent schemes alleged in those three cases are substantially similar to the scheme alleged in this case.  The complaints in those cases specifically alleged the unlawful practices that are central to this case:  inflating the Average Wholesale Price or other benchmarks on which the Government's reimbursement for drugs was calculated, creating a

"spread" between the reimbursement and the actual costs of the drugs, and using other financial incentives to enrich the scheme's participants at the taxpayer's expense.  The complaints in all three actions, which were filed before this action was commenced, named Amgen as one of the pharmaceutical manufacturers which allegedly engaged in the scheme.

Relators argue that "[b]ecause these actions did not contain 'allegations' or disclose 'transactions' involving USON, they cannot bar Relators' claims."  (Relators' Opposition at 23.)  While it is true that U.S. Oncology was not a party to those three actions, Relators do not deny that the cases cited by Defendant involved the same Amgen scheme that is central to this case.  The public disclosure bar applies to an action "based *in any part* upon publicly disclosed allegations."  *U.S. ex rel. Kreindler & Kreindler*, 985 F.2d at 1158 (emphasis added).  This action is clearly based in large part on the Amgen scheme, which involved many health care providers other than U.S. Oncology.  (FAC ¶¶ 66–71.)  Accordingly, the fact that the prior publicly disclosed complaints did not involve U.S. Oncology does not preclude those complaints from serving as a basis for the public disclosure bar.

Original Source

Since the Court concludes that this action was based in large part on publicly disclosed allegations, the Court must next examine whether either of the Relators was an "original source" of the publicly disclosed information.  The term "original source" is defined in 31 U.S.C. § 3730(e)(4)(B), but that definition was altered when the statute was amended in 2009.  Because this action was commenced in 2004, the Court must use the definition set forth in the version of § 3730(e)(4)(B) that was in effect prior to May 20, 2009.

Under that definition, "'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (1994).  The phrase "information on which the allegations are based" refers to the information upon which the relators' allegations are based, not the information on which the publicly disclosed allegations that triggered the public disclosure bar are based. *Rockwell Int'l Corp.*, 549 U.S. at 470–71.  With respect to the "relator's allegations," the Court "looks to the allegations as amended." *Id.* at 474.

In addition to (1) having direct and independent knowledge of the information on which the allegations are based, and (2) having voluntarily provided such information to the government prior to filing suit, a *qui tam* relator must meet a third requirement to be an "original source": having "directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based." *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990). This third requirement is not expressly stated in the statutory definition. Rather, the Second Circuit deduced the requirement from a "close textual analysis combined with a review of the legislative history" of the statute. *Id.*

In *U.S. ex rel. Kreindler & Kreindler*, the Second Circuit "held that a *qui tam* plaintiff does not satisfy the first requirement if a third party is 'the source of the core information' upon which the *qui tam* complaint is based." *United States v. New York Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (citing *U.S. ex rel. Kreindler & Kreindler*, 985 F.2d at 1159); *see also Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995) (reading *U.S. ex rel. Kreindler & Kreindler* as holding that the FCA "bars any claim where a third party is the core source of information underlying that claim"). "[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge

and therefore is not an original source under the Act." *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995) (citing *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante*, 944 F.2d at 1160–61). Accordingly, "collateral research and investigations … [do] not establish 'direct and independent knowledge of the information on which the allegations are based within the meaning of § 3730(e)(4)(B).'" *U.S. ex rel. Kreindler & Kreindler*, 985 F.2d at 1159.

In this case, Relators have not met their burden of establishing that they are original sources. First, neither of the Relators was the source of the core information on which the FAC was based. Piacentile—a "repeat whistleblower" who has filed multiple *qui tam* actions, *Piacentile I*, 2013 WL 5460640, at *1—does not profess to have any connection to Amgen or U.S. Oncology or any direct knowledge of their actions. Rather, the FAC alleges that he "has personal knowledge of U.S. Oncology's practices as a result of an extensive undercover investigation he personally conducted in which he secured admissions from top executives of Amgen and U.S. Oncology regarding the allegations set forth herein." (FAC ¶ 31; *see also* ¶ 44(i).) These third parties were "'the source of the core information' upon which the *qui tam* complaint is based"; Piacentile, who had no direct knowledge of

the alleged wrongdoing, is not an original source. *See New York Med. Coll.,* 252 F.3d at 121.

The FAC also makes it clear that Kilcoyne is not the source of the core information on which the FAC is based. Though a highly successful sales representative, Kilcoyne was not a "top executive" and "contributed nothing to the exposure of the fraud." *See U.S. ex rel. Kreindler & Kreindler,* 985 F.2d at 1157; *U.S. ex rel. John Doe,* 960 F.2d at 319. Indeed, the FAC itself alleges that Kilcoyne is simply "able to confirm … much of the information gleaned through Dr. Piacentile's investigation." (FAC ¶ 44(ii).)

Second, the timing of Relators activities' make it clear that they could not have "directly or indirectly been a source to the entity that publicly disclosed the allegations on which [the] suit is based." *U.S. ex rel. Dick,* 912 F.2d at 16. Although the FAC includes the conclusory assertion that this "investigation was conducted at a time when none of the alleged conduct had been publicly disclosed," the Court notes that the pleading itself either states or implies that Piacentile's "top executive" informants were interviewed sometime between 2002 and 2004. Louviere and Corrao both told Piacentile about the February 28, 2002, agreement they negotiated for Amgen and U.S. Oncology; therefore, they must have been interviewed after that date. (FAC ¶¶ 73, 77.) The FAC alleges that Radford was the

"Director of Business Development for U.S. Oncology from 2002 to at least 2004," (*id.* ¶ 91), implying that Piacentile interviewed her in 2004 and therefore does not know how long she remained in her position thereafter. And the FAC expressly alleges that Piacentile interviewed Lorenz in 2004. (*Id.* ¶ 126). Since these are the only "top executives" mentioned in the FAC, the Court concludes that Piacentile's investigation was conducted after 2001, when the complaint in *Citizens for Consumer Justice* was filed.

Kilcoyne is alleged to have "met with U.S. Oncology/Berkshire Hematology Oncology routinely from 2002 through 2005," visiting three of that organization's Western Massachusetts locations more than 40 times from June 2002 through November 2004 to, among other things, deliver rebate checks. (FAC ¶¶ 113–20.) Kilcoyne visits to the U.S. Oncology practices occurred after the complaint in *Citizens for Consumer Justice* was filed. Accordingly, this Court concludes that Relators have not met the burden of proving that they are an independent source and that the public disclosure bar strips the Court of subject-matter jurisdiction over this action.

Failure to State a Claim

Even if the Court had jurisdiction, it would dismiss this action for failure to state a claim. Generally, a pleading need only contain "(1) a short

and plain statement of the grounds for the court's jurisdiction …; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought …." Fed. R. Civ. P. 8(a). However, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[C]ourts routinely require FCA claims to comply with Rule 9(b)." *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995).

Rule 9(b) states that "[i]n alleging fraud …, a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "That ordinarily requires a complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)). "The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *U.S. ex rel. Ladas*, 824 F.3d at 25 (quoting *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d

Cir. 1991)).  The Second Circuit recognizes and rigorously enforces "these salutary purposes of Rule 9(b)." *Id.* (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).

"Despite the generally rigid requirement [of Rule 9(b)], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *U.S. ex rel. Chorches*, 865 F.3d at 81–82 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). However, "[t]this exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Wexner*, 902 F.2d at 172.  "[A] complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Id.*

The FAC alleges specific facts regarding the Amgen scheme but virtually no facts regarding U.S. Oncology's allegedly false claims.  The allegations concerning the false claims that are the subject of the FAC and state-law claims amount to a few general and/or conclusory sentences. First, Relators allege that "U.S. Oncology's network physicians, to whom Amgen provided illegal remuneration and kickbacks, prescribed large volumes of Amgen drugs to Medicaid and Medicare patients and beneficiaries of other government healthcare programs in violation of

federal and state laws." (FAC ¶ 49.) Relators then reason that "U.S.
Oncology, which conducts all billing for its network physicians, …
submitted claims to Medicaid, Medicare and other government healthcare
programs and obtained hundreds of millions of dollars worth of payments
from the United States and the named States" (*Id.* ¶ 50.) The FAC does not
allege specific facts relating to the allegedly fraudulent claims, such as who
signed the claims, when such claims were submitted, where such claims
were submitted, and the content of the claims, including whether the claims
requested a certain amount of money or just reimbursement for certain
services. Rather, the FAC resorts to conclusory and/or general allegations:
that U.S. Oncology "routinely escalated the reimbursement rate for the
drugs it purchased from Amgen," (*id.* ¶ 80); "made it a practice to never
report kickbacks or price discounts received from Amgen to the
Government," (*id.* ¶ 82); "filed false and/or fraudulent certifications
regarding compliance with the AKS and the Medicaid Rebate Statute in
violation of the FCA," (*id.* ¶ 85); and "falsely certified, in violation of the
FCA, that the claims it submitted or caused to be submitted to the
Government were made in compliance with federal law, including the
prohibitions against kickbacks and illegal remuneration to physicians," (*id.*
¶ 86).

Although the FAC alleges that these claims were filed between 2001 and 2011, the FAC alleges virtually no facts pertaining to events after 2005. Indeed, as discussed above, Relators' information appears to pertain solely to the period prior to 2005. The FAC's few allegations regarding the six years thereafter appear to be based on assumptions drawn from settlement agreements and other publicly disclosed information.

The lack of particularity is highlighted by the contrast between the fourteenth cause of action, which alleges violations of the Massachusetts False Claims Act; the nineteenth cause of action, which alleges violations of the Texas Medicaid Fraud Prevention Act; and the other 18 causes of action. The fourteenth and nineteenth causes of action, in marked contrast to the other state-law claims, recap those allegations contained in the 133 paragraphs which relate to Massachusetts and Texas, respectively. The first paragraph of the fourteenth cause of action specifically identifies seven paragraphs detailing activities of U.S. Oncology alleged to have occurred in Massachusetts, (FAC ¶ 271), then recaps those allegations in the next three paragraphs. Those paragraphs—which allege that Kilcoyne recalled delivering "rebate" checks to physicians at three Massachusetts-based U.S. Oncology practices and to Berkshire Hematology Oncology, a U.S. Oncology practice, and that "Berkshire Hematology Oncology never

reported these illicit kickback checks to the State of Massachusetts when submitting claims for payment to the government-run health care programs," (*id.* ¶¶ 272–74) — do not contain specifics regarding the claims themselves. But they do serve the highlight the lack of particularity of the other 18 causes of action, which do not provide even this level of specificity.

Similarly, the first paragraph of the nineteenth cause of action identifies three paragraphs alleging that U.S. Oncology was incorporated in Texas and operated a billing center there. (*Id.* ¶ 303.) The next three paragraphs essentially repeat those allegations, then end with the conclusory allegation that the "illegal conduct set forth above was part of U.S. Oncology's main strategy for driving revenue and profits, and was known about, negotiated for, approved of, and promoted by executives at U.S. Oncology's highest levels, include the corporate office in Texas." (*Id.* ¶¶ 304–06.) This cause of action does not refer to specific claims made to Texas agencies, but it is still more detailed than any causes of action other than the fourteenth.

The 18 causes of action other than the fourteenth and the nineteenth contain no factual allegations whatsoever. Rather, they cite to 133 paragraphs of allegations, leaving it to the reader to guess which allegations apply to each of the 18 causes of action. Moreover, even when one scours

the 133 paragraphs, one finds no allegations specific to any state-law claims other than the fourteenth and nineteenth causes of action. To find that these causes of action meet the particularity requirements of the Rule 9(b) would be to strip that requirement of any meaning.

The lack of particularity in these statements may be explained by the fact that neither Kilcoyne nor the informants interviewed during Piacentile's investigation have much knowledge regarding the claims that U.S. Oncology filed with the Government. Louviere was U.S. Oncology's Vice President for Marketing; Radford was the corporation's Director of Business Development; and Corrao, Lorenz, and Kilcoyne all worked for Amgen. The allegations in the FAC indicate that Louviere and Radford provided information concerning Amgen's scheme and U.S. Oncology's involvement in it; there is no indication that they provided information regarding the claims U.S. Oncology filed with the Government. However, the FAC does not attempt to explain the lack of particularity by asserting that the facts relating to the claims U.S. Oncology filed with the federal and state governments are peculiarly within the knowledge of U.S. Oncology. Indeed, none of the allegations relating to the filing of claims with the Government are alleged to be on information and belief.

In arguing that the allegations of the FAC are sufficiently particular, Relators assert that *U.S. ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267 (D. Mass. 2010), is instructive.  (Relators' Opposition at 2.)  *U.S. ex rel. Westmoreland* is not only an opinion authored by a district court from another circuit and not binding on this Court, but it also actually supports a finding that the FAC's allegations lack sufficient particularity.  It states: "In cases where the defendant directly presents the claim to the government, the plaintiff must provide details identifying particular false claims submitted, including who filed the claims, the content of the claims, when such claims were submitted, where such claims were submitted, and how much it sought in payment."  *U.S. ex rel. Westmoreland*, 738 F. Supp. 2d at 275.  The FAC does not provide any of these details.

The Court also notes that the FAC's fifth and sixth causes of action have not cured the deficiencies which this Court discussed in *Piacentile II* in connection with the TAC's third cause of action.  The fifth and sixth causes of action allege violations of the so-called "reverse false claims" provision, which "covers claims of money owed to the government, rather than payments made by the government."  *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 368 (S.D.N.Y. 2014).  To prove such a claim, a plaintiff must show: (1) 'proof that the defendant made a false record or

statement' (2) at a time that the defendant had a presently-existing 'obligation' to the government—'a duty to pay money or property.'" *Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) ). "Where a complaint 'makes no mention of any financial obligation that the [defendants] owed to the government,' and 'does not specifically reference any false records or statements used to decrease such an obligation,' the court should dismiss" such a claim. *Id.* (quoting *Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009) (amended summary order)).  In the FAC, as in the TAC, Relators have not specifically identified the financial claim that U.S. Oncology owes to the government and has not specifically identified false records or statement used to decrease that obligation.

Similarly, the FAC's seventh and eighth causes of action have not cured the deficiencies which this Court discussed in *Piacentile II* in connection with the TAC's fourth cause of action.  To state a claim for conspiracy to violate the FCA, a relator must allege facts to suggest that: "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States' and '(2) one or more conspirators performed any act to effect the object of the conspiracy." *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 331 (S.D.N.Y. 2004)).  Relators

have done neither.  First, the FAC itself suggests the absence of a conspiracy, accusing U.S. Oncology of using its purchasing power to "shake down" Amgen and force it to "bend the rules" in other ways.  (FAC ¶ 101).  Moreover, the FAC does not allege that the two entities conspired to get false or fraudulent claims paid by the federal or state governments.

The Court agrees with Defendant that it would have been futile to grant Relators leave to amend the complaint for a fifth time.  The Court explained the defects in the TAC in *Piacentile II* but those defects have not been cured.  Although the FAC adds some more factual details relating to Amgen's scheme, its allegations relating to the claims underlying the causes of action still lack the particularity required by Rule 9(b).  There is no reason to believe that Relators will be able to cure the defects if given another chance.  As explained above, neither the Relators nor the informants interviewed by Piacentile appear to have personal knowledge regarding the claims U.S. Oncology allegedly made to the federal and state agencies.

P-049

## CONCLUSION

For the reasons stated above, U.S. Oncology's motion to dismiss is granted and this action is dismissed with prejudice. The Clerk of Court is respectfully directed to enter judgment in favor of Defendant and to close this case.

**SO ORDERED.**

Dated: Nov 23         , 2021
       Brooklyn, New York       Sterling Johnson, Jr., U.S.D.J.